IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
7:11-CR-41-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| VINCENT EDWARD NORTHINGTON, | ) | |
| | ) | |
| Defendant. | ) | |

This case comes before the court on defendant's motion to suppress (D.E. 23), which includes an incorporated supporting memorandum. Defendant also filed a supplemental memorandum (D.E. 34). The government filed a response memorandum (D.E. 24) and a supplemental memorandum (D.E. 35). The motion was referred to the undersigned for an evidentiary hearing and memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* first Docket Entry of 24 August 2011). For the reasons stated below, it will be recommended that defendant's motion be granted and that all evidence obtained as result of the investigatory stop of defendant be excluded from use at trial in the government's case-in-chief.

## PROCEDURAL BACKGROUND

On 22 March 2011, defendant was indicted (D.E. 1) on charges of: possession of a firearm (*i.e.*, a Mossburg 12-gauge shotgun) by a convicted felon on or about 6 June 2010 in violation of 18 U.S.C. §§ 922(g)(1) and 924 (ct. 1); and possession of firearms (*i.e.*, a Star 9 mm handgun and a Smith and Wesson .357 Magnum revolver) and ammunition by a convicted felon on or about 10 October 2010 in violation of 18 U.S.C. §§ 922(g)(1) and 924 (ct. 2).

On 5 August 2011, defendant filed the instant motion to suppress. The suppression motion seeks suppression of all evidence taken during and derivative from a search of a vehicle on 6 June 2010 that led to count 1 of the indictment (*i.e.*, possession of a shotgun) against defendant.

The undersigned conducted a hearing on the motion on 12 September 2011. (D.E. 31). At the hearing, the government presented the testimony of two deputies with the Onslow County Sheriff's Office who were involved in the events in question: Captain Jason Daughtry ("Daughtry") and Deputy Larry Johnson ("Johnson"). (Transcript of Hearing ("Tr.") (D.E. 33) 5:1-4; 81:5-6). At the hearing, the court admitted as exhibits two photographs depicting a grass-covered traffic median offered by the government without objection by defendant. (Gov.'s Hrg. Exs. 1, 2). The court also considered, without objection from the government, the two exhibits defendant included with his motion: a 6 June 2010 Incident/Investigation Report by Daughtry (Def.'s Mot., Ex. A (D.E. 23-1)) ("Incident Report") and a 2011[1] letter from Daughtry to Special Agent Christopher Speer of the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") (Def.'s Mot., Ex. B (D.E. 23-2)) ("ATF Letter"). Counsel for the parties were each granted leave to file, and did file, supplemental memoranda after the hearing transcript became available.

## TESTIMONY OF DAUGHTRY AND JOHNSON

The following is a summary of the hearing testimony of Daughtry and Johnson:

Daughtry began working for the Onslow County Sheriff's Office in November 2006. (Tr. 5:5-7). He worked for 10 months as the jailer of the Onslow County Detention Center and after 4 months of training began service in investigations. (*Id.* 5:13-19). He had been in

---

[1] Though the letter is not dated, Daughtry testified at the hearing that the letter was sent as an attachment to an email in 2011. (Tr. 68:21 to 69:2). He could not recall when in 2011 he sent it. (*Id.*).

investigations for about 2 1/2 years at the time of the stop of defendant. (*Id.* 5:18-19). Earlier this year, he became security captain for the Onslow County jail and training coordinator for the Onslow County Sheriff's Office.[2] (*Id.* 5:22-24). Johnson had been with the Onslow County Sheriff's Office for almost 3 1/2 years at the time of the stop. (*Id.* 81:7-9).

At approximately 3:00 a.m. on Sunday, 6 June 2010, Johnson responded to a call regarding a black male with a shotgun in the parking lot of the Circle K gas station in Jacksonville, North Carolina. (Tr. 6:5-9;[3] 88:19 to 89:6). Johnson did not recall receiving any other description of the suspect. (*Id*. 89:13-18). When Johnson arrived at the Circle K, officers from the Jacksonville Police Department were already on the scene. (*Id*. 89:6-12). The suspect described in the call was not found at the scene. (*Id*. 89:19-22). However, in the parking lot, Johnson found an unoccupied, silver, four-door Nissan Altima ("the Nissan") running with the keys in the ignition, the windows rolled down, and loud music playing. (*Id*. 12:18; 89:23 to 90:4). Johnson ran a check of the Nissan's State of Washington license plate, but the check did not provide him with a local address or any other information that would allow him to contact the owner. (*Id*. 90:18-22). Unable to locate the owner of the vehicle, Johnson secured the vehicle by locking the keys in the car and rolling up the windows.[4] (*Id*. 90:11-16, 23, 24).

Around 5:00 a.m. the same morning, Johnson responded to a call about two unconscious black males in a vehicle in the parking lot of a Shell gas station on Gum Branch Road in Jacksonville. (*Id*. 82:16 to 83:7). Daughtry, who heard the call as he was driving home from his

---

[2] The prosecutor noted in passing in a question that Daughtry has 15 years of law enforcement experience, but the record does not show it. (Tr. 11:11-14). Although Daughtry testified that he served in the Coast Guard for 10 years prior to joining the Onslow County Sheriff's Office, there is no evidence regarding the nature of that service. (*See id.* 5:8-10). Notwithstanding this claim that Daughtry had extended law enforcement experience, the prosecutor sought to justify Daughtry's repeated recourse to a copy of his report during direct examination by stating that "testifying can be a little nerve-racking." (*Id.* 22:8-9).
[3] Although counsel for the government referred to the relevant date as 10 June 2010 when examining Daughtry at the hearing, it is undisputed that the date of the incident was 6 June 2010. (*See* Incident Rpt. 1).
[4] There is no evidence of any ongoing surveillance of the vehicle.

off-duty security job at a local motel, drove to the scene to assist Johnson in the investigation. (*Id*. 6:5-9; 7:3-14; 84:14-25). During the investigation, Johnson told Daughtry about the earlier incident at the Circle K gas station. (*Id*. 85:1-16; 96:15-22). While Johnson did not describe the incident in detail, he did tell Johnson that the unoccupied car left running at the scene was a Nissan Altima. (*Id*. 96:23 to 97:8).

While standing in the parking lot of the Shell station, Daughtry observed a four-door sedan, which was traveling west on Gum Branch Road, turn off the road and into a subdivision. (*Id*. 7:25 to 8:8; 11:2-10). As it turned into the subdivision, the car struck a grassy traffic median and then continued into the subdivision. (*Id*. 7:25 to 8:8; 11:2-10). Daughtry considered this event a traffic accident. (*Id., e.g.*, 7:25 to 8:8). Johnson did not observe the accident. (*Id*. 95:6-8).

Daughtry testified that he became suspicious that the driver might be intoxicated or experiencing a medical emergency and decided to pursue the vehicle into the subdivision. (*Id*. 11:11-25). Johnson also undertook pursuit in his own vehicle. (*Id*. 12:1-2). Daughtry and Johnson were initially unable to locate the vehicle, and Johnson returned to the Shell station to finish his investigation there. (*Id*. 12:4-8).

Daughtry continued his search and came upon two vehicles parked in front of defendant's house at 451 Hunting Green Drive. (*Id*. 12:9-10; 13:2-14; 45:21-22). The vehicles were both facing in the opposite direction of Daughtry's vehicle. (*Id*. 12:9-10; 13:2-14; 45:21-22). Daughtry testified that one of the vehicles, a four-door silver Nissan Altima, was the car that he had just observed strike the traffic median. (*Id*. 12:10-12). Daughtry also observed defendant standing outside talking to someone inside the second car, a taupe Oldsmobile. (*Id*. 12:19-24). Defendant appeared to Daughtry to have dreadlocks. (*Id*. 17:24-27).

4

Daughtry activated his blue lights and exited his patrol car. (*Id*. 13:17-20). Daughtry then observed defendant walk away from the Oldsmobile. (*Id*. 13:20-22). Daughtry asked defendant if the Nissan was his vehicle, and when defendant responded that it was, Daughtry indicated he wanted defendant to stand by it. (*Id*. 13:22-23; 43:24 to 44:6; 44:13-15; *but see id.* 68:15-17 (defendant as denying car was his)). As Daughtry attempted to approach the Oldsmobile, it drove away. (*Id*. 13:24-25).

Daughtry identified himself and approached defendant. (*Id*. 14:19-23). Daughtry observed that the Nissan had out-of-state tags, a military sticker, a broken window on the rear driver's side, and broken glass in the back seat. (*Id*. 14:22 to 17:7). Daughtry further observed that the hood was warm; there was no dew on the vehicle, even though the dew had already set in that morning; and the hood was raised approximately one quarter of an inch, which he believed was consistent with damage that could have been caused by a median strike. (*Id*.). Daughtry testified that, based on these observations, he suspected that the car could have been stolen. (*Id*. 16:5-16; 46:1-9).

Daughtry then asked defendant for his name and identification. (*Id*. 15:5-7; 20:13-15). Defendant identified himself and also immediately told Daughtry that he was a convicted felon, which Daughtry characterized at the hearing as "kind of highly uncommon." (*Id*. 18:15-22; 51:3-16). Stating that he had identification in the car, defendant produced a set of keys, entered the vehicle, and retrieved a South Carolina traffic citation from the glove box. (*Id*. 18:11-14; 20:13-25). The traffic citation corroborated the name and date of birth defendant had provided to Daughtry. (*Id*. 21:18-15). When Daughtry questioned defendant about the traffic accident, defendant denied knowledge of the accident and stated that he had been at his house all night. (*Id*. 20:4-12). He told Daughtry that the car belonged to his girlfriend, Leah, and that she had

Case 7:11-cr-00041-H Document 39 Filed 11/30/11 Page 5 of 20

been home for an hour. (*Id*. 19:4 to 20:3). Daughtry noted that defendant was speaking rapidly and erratically and waving his hands when he spoke. (*Id*. 18:23 to 19:3).

Daughtry next called dispatch and verified defendant's name and date of birth. (*Id*. 21:19-22; 22:18-20; 23:7-8; 50:17-24). He also learned from dispatch that defendant had prior convictions for drug and gun offenses, and dispatch confirmed his status as a felon. (*Id*. 23:10-25). Daughtry also provided dispatch with the license tag number of the Nissan. (*Id*. 24:1-5; 52:2-8). Dispatch disclosed that the car's owner's name was Megan Gerado[5] and that the car was noted as having been present at the scene of the earlier Circle K incident. (*Id*. 24:4-19; 32:23 to 33:10). However, dispatch did not report that the car had been reported as stolen. (*Id*. 54:1-3). Daughtry did not question defendant about Gerado or the Circle K incident. (*Id*. 62:4-5; 63:1-6).

As a result of learning that the car was connected to the Circle K incident, Daughtry requested that Johnson respond to the scene. (*Id*. 25:13-25; 87:1-19). Daughtry continued to question defendant about the traffic accident, and defendant continued to deny knowledge of it. (*Id*. 26:5-11). Although Daughtry had asked defendant, for officer safety, to place his hands on the trunk while he spoke, defendant continued to lift his hands off the trunk. (*Id*. 26:12-24). Daughtry asked defendant if he could conduct a search of defendant's person, and defendant consented. (*Id*. 26:25 to 27:1). During the search, Daughtry found a wallet and a three-inch pocket knife and placed the items on the trunk of the Nissan. (*Id*. 27:2-14).

When Johnson arrived on the scene,[6] he confirmed that the Nissan was the car he found at the Circle K. (*Id*. 28:5-11; 29:21-22). After defendant continued to remove his hands from

---

[5] The Incident Report states this name as "Megan Jerido." (Incident Rpt. 2).
[6] Johnson was apparently accompanied by another person who was not called as a witness or even identified at the hearing. (Tr. 75:16-23).

the trunk, Daughtry put defendant in handcuffs, placed him in the back of the patrol car, and informed him that was being detained for an "investigatory stop." (*Id*. 28:21 to 29:5).

Daughtry then asked Johnson, who is a canine handler, to conduct a drug sniff of the car. (*Id*. 28:13-16; 29:22-24; 92:25 to 93:8). Daughtry testified that he asked defendant if he had any firearms or narcotics in the car before the sniff was conducted. (*Id*. 30:8-18; 64:24 to 65:2). Defendant responded that he had smoked marijuana in the vehicle earlier. (*Id*. 31:2-4; 30:18-19). Daughtry also asked defendant for consent to search the vehicle, but defendant declined on the grounds that the vehicle did not belong to him. (*Id*. 30:20 to 31:1). When Johnson conducted the sniff, the dog alerted to the front driver's side door, the rear driver's side door, and the trunk. (*Id*. 30:2-7; 93:4-16). Daughtry testified that during the subsequent search of the vehicle, he found a set of digital scales in the center console of the passenger compartment and a pump shotgun in the trunk. (*Id*. 69:18 to 70-11; 93:21-25). As a result, defendant was placed under arrest. (*Id*. 94:8-10).

Immediately after taking defendant before the magistrate, Daughtry wrote the Incident Report about the events leading up to defendant's arrest. (*Id*. 34:15-18). At least six months later, in 2011, Daughtry wrote a letter at the request of ATF agent Chris Speer to "fill in some holes in [his] initial report." (*Id*. 65:18-25; 68:25 to 69:2; 77:25 to 78:8).

## **DISCUSSION**

I.   **APPLICABLE LEGAL PRINCIPLES**

A.   *Terry* **Stops**

The Fourth Amendment of the United States Constitution protects "against unreasonable searches and seizures." U.S. Const. amend. IV. In *Terry v. Ohio*, the United States Supreme Court held that while "not all personal intercourse between policemen and citizens involves

'seizures' of persons," when "a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16, 19 n.16 (1968). However, the Court in *Terry* also held that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30); *see also United States v. Williams*, No. 11-4414, 2011 WL 4866760, at *1 (4th Cir. 14 Oct. 2011). "Investigatory stops are also permissible if the officers act on a reasonable suspicion that the person stopped was involved in a completed crime." *United States v. Basey*, 816 F.2d 980, 988 (5th Cir. 1987). "Whether there is reasonable suspicion to justify the stop depends on the totality of the circumstances, including the information known to the officers and any reasonable inferences to be drawn at the time of the stop." *Williams*, 2011 WL 4866760, at *1. Reasonable suspicion is an objective test requiring the court to consider the facts known to the officer and not the officer's subjective beliefs. *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004).

"[R]easonable suspicion must exist at the time the officer stops an individual; . . . it cannot come after the fact." *United States v. Ienco*, 182 F.3d 517, 524 (7th Cir. 1999) (internal citations omitted) (holding that officers responding to a report of two men creating a disturbance in a building did not have the reasonable suspicion necessary to stop the defendant and another man as they exited a building based on a dispatch report that provided no description of the suspects). A person has been seized and a stop begins only when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). A person is deemed

seized "only when, by means of physical force or a show of authority, his freedom of movement is restrained." *Id.* at 553.

"It is the [government's] burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 501 (1983). Further, when a defendant's motion to suppress challenges the constitutionality of a warrantless search, the government has the burden to prove by a preponderance of the evidence that the search was lawful. *United States v. Cauthen*, 669 F. Supp. 2d 629, 633 (M.D.N.C. 2009) (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 454-55 (1971)); *see also United States v. De La Fuente*, 548 F.2d 528, 533 (5th Cir. 1977). The Fourth Amendment requires the suppression of evidence that is the fruit of unlawful police conduct. *United States v. May*, No. 10-4053, 2011 WL 4379301, at *3 (4th Cir. 21 Sept. 2011) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).

### B. Witness Credibility

In assessing the credibility of witnesses, trial courts consider "variations in demeanor and tone of voice." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985). But there are other factors as well. "Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Id.*; *see also United States v. Marcavage*, 609 F.3d 264, 281 (3rd Cir. 2010) (applying factors in *Anderson* in holding that trial court's crediting of the government's evidence was error on the grounds that "[t]here are simply too many inconsistencies and gaps in the testimony of the government's witnesses, not to mention substantial contradictions between that testimony and other evidence in the record"). Courts have allowed motions to suppress challenging the legality of *Terry* stops where the evidence

9

presented by the government was insufficiently reliable to meet its burden of establishing reasonable suspicion to support the stop. *E.g.*, *United States v. Murphy*, 778 F. Supp. 2d 237, 242-45, 255 (N.D.N.Y. 2011); *United States v. Harvey*, No. 2:10 CR 42 PPS, 2010 WL 3219314, at *5 (N.D. Ind. 13 Aug. 2010); *United States v. Mills*, No. 6:09-cr-76-Orl-31DAB, 2010 WL 2508860, at * 4 (M.D. Fla. 17 June 2010); *United States v. Eanes*, No. 3:07-cr-238-MKR, 2008 WL 4533992, at *4, *9 (W.D.N.C. 5 Sept. 2008) (Mem. & Rec'n), *vacated on other grounds*, 2008 WL 5111095 (W.D.N.C. 4 Dec. 2008).

## II.   THE PARTIES' ARGUMENTS

### A.   Government

The government contends that Daughtry had sufficient reasonable suspicion to justify the investigatory stop of defendant up to the time that the canine performed a drug sniff of the vehicle. In its supplemental memorandum, the government asserts two bases for reasonable suspicion. It argues that Daughtry initially had reasonable suspicion that the driver of the Nissan had been driving under the influence, as evidenced by the accident. The government cites to the following alleged facts to support reasonable suspicion of driving under the influence:

> a) a car matching this description was involved in a single car traffic accident, b) the car displayed front-end damage consistent with that accident, and had a warm hood indicating that it was recently driven, c) immediately after the accident, the driver drove the damaged car through a residential area, d) the accident occurred at 5:00 a.m., around the time that bars closed, e) Captain Daughtry's extensive law enforcement experience indicated that accidents at that time of night often involve substance abuse.

(Gov's. Supp. Mem. 4-5).

The government also contends that additional information obtained by Daughtry from his investigation at the scene provided reasonable suspicion that defendant was in possession of a stolen car. The government bases this contention on the following alleged facts:

10

Case 7:11-cr-00041-H   Document 39   Filed 11/30/11   Page 10 of 20

a) the same car was involved in a suspicious incident earlier that evening, b) the car's tags were not local, c) the car's window was recently broken out, d) the driver did not have a driver's license or other personal identification, e) the driver was acting erratically, f) the earlier incident involved a black male with a weapon, g) the driver was a convicted felon.

(Gov.'s Supp. Mem. 4).

In its closing argument at the hearing, the government advanced additional grounds for the existence of reasonable suspicion. Specifically, it contended that once Daughtry learned through dispatch that the car was the same one that had been present at the Circle K, reasonable suspicion existed that defendant has committed the offense of possession of a firearm by a felon, among other offenses. (Tr. 117:18 to 118:11). The government also argued that defendant's admission that he had smoked marijuana in the car earlier established reasonable suspicion of narcotics possession justifying any additional delay that may have been attributable to the canine sniff. (*Id.* 120:20 to 121:2).

### B. Defendant

Defendant's principal argument rests on the contention that Daughtry's statements relating to the stop are not reliable. Because the government's case for the legality of the stop relies on such evidence, defendant argues that the government has failed to meet its burden of showing that there was reasonable suspicion for the stop and therefore that the evidence obtained as a result of it is admissible.

## III. ANALYSIS

The government's case that reasonable suspicion supported the stop of defendant rests almost exclusively on the statements of Daughtry. Daughtry was, of course, the principal witness at the suppression hearing. Although Johnson also testified, he did not arrive at the

scene of the stop until after most, if not all, the events bearing directly on reasonable suspicion had occurred.

In addition, the Incident Report prepared by Daughtry is the only police report on the stop of defendant.[7] (Tr. 70:12 to 71:7). The only other record in evidence regarding the stop is the ATF Letter, which Daughtry prepared. The government did not introduce the report on the incident at the Circle K or any records of the call Daughtry had with dispatch, although Daughtry's testimony suggested that such dispatch records may exist. (*Id.* 23:10-21 (referring to the Onslow Sheriff's Office records management system from which dispatch apparently obtained information it provided Daughtry)). While the government did introduce photographs of the scene of the accident, it offered no photographs of the Nissan.

The centrality of Daughtry's statements to the government's case on the suppression motion results, of course, from the fact that he was the only officer at the scene when most of the key events at issue occurred. Nevertheless, the government's reliance on Daughtry's statements makes his credibility a particularly critical issue on respondent's motion. Analysis of the pertinent factors shows that many of his statements are not credible.

Among them are Daughtry's statements that the car he saw strike the median was the Nissan. Most significantly, Daughtry stated in his report that the car he saw was "dark in color." (Incident Rpt. 2). He confirmed in his testimony that this was his perception. (Tr. 17:12-15). But it is undisputed that the Nissan was silver. (*Id*. 13:2; 88:7-9). When asked, in effect, how a silver car could be considered dark, Daughtry testified: "With the lighting and everything else, the vehicle that I observed was either silver, gray, or charcoal. Dark in color. That is dark in

---

[7] Daughtry testified that he writes a report "to refresh my recollection of the incident." (Tr. 35:2-5; 78:13-16). But when pressed on cross-examination, he conceded that its purpose is also to document what happened for the use of other officers. (*Id*. 35:25 to 36:4). As detailed below, his report of the stop of defendant was deficient under either standard.

Case 7:11-cr-00041-H   Document 39   Filed 11/30/11   Page 12 of 20

color to me." (*Id.* 17:12-14; *see also id.* 38:16-22). The court is skeptical that silver can ever plausibly be characterized as a dark color. Daughtry himself acknowledged that describing the vehicle as dark was not particularly accurate. (*Id.* 39:4-6).

Although in the foregoing quoted testimony Daughtry suggests that "the lighting and everything else" present at the time of the accident justifies his characterization of silver as a dark color, his own testimony belies that premise. (*Id.* 17:12). Elsewhere, he describes in detail the numerous streetlights in the area of the accident and states himself that the lighting was "very good." (*Id.* 9:22 to 10:4; 10:11-13). He also testified that he was only about 300 to 400 yards from the area where the accident occurred and that nothing was obstructing his view. (*Id.* 10:8-10; *see also* 39:9-11). Thus, the record does not show conditions that convincingly explain how a silver vehicle could plausibly be perceived as dark in color.

There does not appear to be any question, though, that Daughtry had the ability to perceive and describe colors with precision. In his report and at the hearing, he described the color of the Oldsmobile as taupe. (Incident Rpt. 2; Tr. 12:24).

Daughtry candidly admitted at the hearing that he was not sure whether the four-door sedan he saw in the accident was either silver, gray, or charcoal–that is, which of the three purportedly dark colors it was. (Tr. 8:6; 38:19-20). But Daughtry also testified that he had no doubt upon arriving at the scene that the Nissan was the vehicle he had witnessed. (*Id.* 17:16-18; 40:18-20). The record does not convincingly explain how Daughtry could be so sure, particularly so quickly, that the Nissan was the car in the accident given his uncertainty about the car's color. During cross-examination, he testified that he had noted other identifying features of the Nissan, namely, "the design and the headlights, the design of taillights as they drove away." (*Id.* 40:21-24). But he provided no detail regarding any of these features or what he meant by

13

them. The design of the taillights was, in any event, irrelevant because, according to his testimony, he recognized the Nissan before he had seen the back of it. (*See id.* 13:20-24; 14:19-24).

Further, although Daughtry testified that he had no doubt that the Nissan was the same car he had seen, he said that he checked the Oldsmobile for front-end damage, the type of damage the vehicle in the accident would have incurred. (*Id.* 13:25 to 14:6; 41:9-20). There would have been no reason for him to check the Oldsmobile for front-end damage if he truly believed, as he said, that the Nissan was the car in the accident. He offered no explanation why he checked the Oldsmobile.

Daughtry cited the purported front-end damage to the Nissan's hood as further evidence that the Nissan was the vehicle he had seen. (*Id.* 17:1-7). But he did not mention this damage in the Incident Report or ATF Letter. (*See, e.g., id.* 47:3-13 (Daughtry acknowledging without explanation that he did not mention hood damage in his report)). Instead, the record shows that the first time he disclosed it was at the hearing. (*See id.* 47:9-13). It is difficult to understand why he would not have referred to the hood damage to the Nissan in his report when he did note the absence of front-end damage to the Oldsmobile, which he testified he was sure was not the vehicle in the accident even before inspecting it. (Incident Rpt. 2; Tr. 41:3-20).

The lack of reliability of Daughtry's statements regarding the Nissan matching the car in the accident seriously undercuts the government's theory that Daughtry had reasonable suspicion to stop defendant for driving under the influence. As indicated, this theory relies expressly on the fact that there was a match or, at least, a reasonable basis to believe there was.

Moreover, although Daughtry testified that he suspected defendant of driving under the influence, there is no evidence that he asked him during the stop if he had been drinking. (Tr.

14

38:10-12; *see also id.* 56: 7-9). Nor is there any evidence that he ever administered any field sobriety or other test to defendant to determine whether he had been drinking or was otherwise under the influence. The lack of such action by Daughtry obviously undermines the credibility of his contention that he suspected defendant of driving under the influence. *See Eanes*, 2008 WL 4533992, at *4, *9 (finding police officer's testimony about traffic stop not credible, in part, on the grounds that despite officer's testimony that he was certain that defendant, who was a passenger in the car, had a gun under the passenger seat, officer failed to frisk defendant, left defendant in the vehicle while questioning the driver outside the vehicle, and, during the subsequent search of the car, searched *other* parts of the car before looking under the passenger seat); *see also United States v. Powell*, --- F.3d ----, No. 08-4696, 2011 WL 5517347, at *4 (4th Cir. 14 Nov. 2011) (rejecting government's argument that the totality of circumstances provided reasonable suspicion that defendant was armed and dangerous and noting that "[i]t is particularly telling that [the officer] told [defendant] during the traffic stop that he was free to leave if he wanted, which is an implicit acknowledgement that he did not consider [defendant] to be armed and dangerous").[8]

Similarly, although Daughtry said he was investigating whether the Nissan was involved in the Circle K incident, he did not ask defendant anything whatsoever about it. (Tr. 62:19 to 63:6; 64:5-10). Indeed, he did not ask defendant about any criminal behavior other than the accident. (*Id.* 76:6-8).

Daughtry contradicted himself about whether defendant claimed the Nissan was his when he first arrived at the scene of the stop. Daughtry testified on direct examination: "I said, is that

---

[8] Daughtry's conduct also undermines the notion that an officer would suspect defendant of driving under the influence under the circumstances before Daughtry, although, as indicated, Daughtry had limited experience as an officer. The subjective suspicions of Daughtry, or any other particular officer, are not, of course, determinative of reasonable suspicion because the test is an objective one. *See Foreman*, 369 F.3d at 781.

15

Case 7:11-cr-00041-H   Document 39   Filed 11/30/11   Page 15 of 20

your vehicle, and he said, *yes*. And I said, can you stand by it. . . . He said, *yes*. I said, can you go stand by it." (*Id.* 44:5-7) (emphasis added). On cross-examination, however, he testified: "[W]hen I asked him when I got out of the vehicle, is that your car and he said *no* and I asked him to go stand by it." (*Id*. 68:15-17) (emphasis added). Daughtry's confusion on this point is particularly notable since he claims he was eventually investigating whether the Nissan was stolen.

There is also a discrepancy between Daughtry's accounts as to when he identified himself. In his report, he states that he identified himself upon exiting his vehicle. (Incident Rpt. 2) ("I . . . exited my vehicle identifying myself as a deputy sheriff.")). At the hearing, however, he said he identified himself after he had indicated for defendant to stand by the Nissan, had approached the Oldsmobile, and had watched it drive off. (*Id*. 14:21-23). Because Daughtry's self-identification as a law enforcement officer to defendant is a display of authority, the timing of it could have a bearing on the time as of which the stop of defendant began and thereby reasonable suspicion was required to exist.[9]

On another topic, although Daughtry testified that defendant appeared to have dreadlocks at the scene of the stop, he did not mention the dreadlocks in the narrative portion of his report (Incident Rpt. 2-4) or in the space on the report form for hair style (*see id.* 2). He also testified at the hearing that dispatch told him that the black male at the Circle K incident had dreadlocks, evidence clearly tending to associate defendant with that incident. (*See id.* 54:12 to 55:7). But he gave this testimony only after failing to mention the dreadlocks on direct and earlier cross-examination concerning the information he obtained from dispatch. (*See id., e.g.*, 24:7-10; 52:18 to 53:20). Nor did he mention dreadlocks in the portion of his report summarizing the

---

[9] Other apparent displays of authority by Daughtry included his activation of the blue lights on his car and his being dressed in his uniform. (Tr. 6:10-12; 13:17-18; *see also id.* 6:19-21 (location of blue lights on Daughtry's unmarked car)).

Case 7:11-cr-00041-H   Document 39   Filed 11/30/11   Page 16 of 20

information he obtained from dispatch. (*See* Incident Rpt. 3). Johnson did not include any mention of dreadlocks in his testimony describing the information dispatch had provided him about the Circle K incident. (Tr. 89:2-18). *See Mills*, 2010 WL 2508860, at *4 (finding officer's testimony about defendant giving consent for a search of a vehicle not credible, in part, on the basis of inconsistent testimony of other officers present during the traffic stop).

An inconsistency between Daughtry and Johnson is even more apparent with respect to another matter. In his report, Daughtry states, "A/Northington had told me *just previously* to Deputy Johnson's arrival that he and the owner of the vehicle had been in an altercation earlier this day." (Incident Rpt. 3) (emphasis added). Johnson, though, testified specifically at the hearing that he was, in fact, present when defendant made that statement. (Tr. 92:2-7). While the timing of defendant's statement in relation to Johnson's arrival at the scene is not particularly important, the fact that there is such conflicting evidence on a point Daughtry specifically noted in his report does detract from his reliability.

As a further example, Daughtry testified that *before* Johnson conducted the canine sniff he asked defendant if there was anything in the vehicle Daughtry should be aware of and defendant admitted having previously smoked marijuana in the car. (*Id*. 65:1-8; *see also id.* 30:8-19 (question posed and admission made before canine alerted)). Obviously, a statement by defendant indicating that there could be contraband in the car would have provided reasonable suspicion justifying any delay resulting from the subsequent canine sniff. But in both his report and the ATF Letter, Daughtry stated that he asked defendant this question and defendant made his admission *after* the canine sniff and before the search of the vehicle. (Incident Rpt. 3; ATF Ltr.). Daughtry took the position at the hearing that his report was incorrect in this regard. (Tr. 72:19 to 73:8).

In addition, while Daughtry stated in his report that he "searched the vehicle passenger compartment with negative results" (Incident Rpt. 3), he stated in the ATF letter and at the hearing that this search revealed a set of digital scales. (ATF Letter; Tr. 70:1-6). The deficiency is particularly striking since the search of the car, prompted by a canine sniff, was directed toward discovering drugs and presumably related paraphernalia.

Further, Daughtry stated in the ATF Letter that defendant "admitted to operating the motor vehicle" (ATF Ltr.), but in his report stated that defendant denied driving the vehicle (Incident Rpt. 3). At the hearing, Daughtry testified that the ATF Letter was, indeed, in error and that defendant had admitted that he controlled the Nissan, but denied that he had driven it. (Tr. 68:7-20). The purported error in the ATF Letter is especially notable because the letter suggests that the ATF requested it to obtain information "as to [defendant's] statements during the investigatory stop and arrest."[10] (ATF Ltr.).

At the hearing, Daughtry testified that defendant disclosed that he was a felon as part of his response to Daughtry's request at the outset of the stop that he identify himself. (Tr. 18:15-22). An admission by defendant to felon status so early in the stop would clearly facilitate the showing of reasonable suspicion. But in his report, Daughtry indicates that he learned defendant was a felon only later and not from defendant but dispatch. (Incident Rpt. 3). The report states: "I placed a phone call to dispatch and . . . was also *informed* that A/Northington was a convicted felon." (*Id.*). In contrast, at the hearing he spoke of dispatch *confirming* that defendant was a felon. (Tr. 23:22-25; 56:22-23). Daughtry's omission of defendant's alleged admission of felon status from the report is all the more notable because it was, in Daughtry's words at the hearing, "kind of highly uncommon." (*Id.* 51:14).

---

[10] The letter is not, of course, limited to this topic.

18

Case 7:11-cr-00041-H   Document 39   Filed 11/30/11   Page 18 of 20

Further detracting, at least to some degree, from Daughtry's credibility is the fact that various portions of the direct examination of him were leading in character. (*Id., e.g.*, 14:21; 15:8-10; 18:3-4; 18:15-17; 19:7-8; 19:10-11; 21:7; 21:15-17; 30:13-15; 30:20-21). In addition, Daughtry repeatedly looked at his report for the first two-thirds of his direct examination before the questioning was stopped and Daughtry provided time to review it. (*Id.* 21:23 to 22:16). The inference, of course, is that Daughtry lacked a strong, if any, independent recollection of the events about which he was being examined.

The court concludes that Daughtry is not a reliable source of information regarding the stop of defendant. As discussed, his lack of credibility is shown by a broad range of factors, including the implausibility of certain statements he made, the inconsistency of his conduct with certain statements, the inconsistency of his testimony with his report and/or the ATF Letter, the inconsistency of portions of his testimony with other portions, the inconsistency of his testimony with portions of Johnson's testimony, omissions from his report, and other factors. Some of the statements shown to lack credibility relate to facts central to the question of reasonable suspicion and their unreliability therefore directly undermines the government's case on that issue. But the other statements are also material to reasonable suspicion because they shed light on Daughtry's overall credibility.

Similarly, there are statements by Daughtry that do not themselves bear indicia of unreliability and there is some evidence tending to support Daughtry's credibility, such as Johnson's corroboration of Daughtry's testimony that defendant was acting erratically (*see id.* 92:10-21). However, the number of statements that do bear such indicia, the significance of many of these statements to the issue of reasonable suspicion, and the underlying deficiencies in veracity the demonstrably noncredible statements reveal, such as possible misperceptions,

19
Case 7:11-cr-00041-H   Document 39   Filed 11/30/11   Page 19 of 20

deficient memory, and embellishment, render all of Daughtry's statements unreliable. Given the government's reliance on Daughtry's statements to support its case on reasonable suspicion, his lack of credibility precludes the government from establishing by a preponderance of the evidence that reasonable suspicion existed. Defendant's motion to suppress should accordingly be allowed.

## **CONCLUSION**

For the foregoing reasons, the government has failed to meet its burden of showing by a preponderance of the evidence that there was reasonable suspicion to support the investigatory stop of defendant. It is therefore RECOMMENDED that defendant's motion to suppress (D.E. 23) be granted and that all evidence obtained as result of the stop of defendant be EXCLUDED from use at trial in the government's case-in-chief. *See Wong Sun*, 371 U.S. at 484.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who have 14 days or such other period as the court may direct in which to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

SO ORDERED, this the  29  day of November 2011.

_____
James E. Gates
United States Magistrate Judge